DISCIPLINARY COUNSEL *v.* RICKETTS.

[Cite as *Disciplinary Counsel v. Ricketts*,

128 Ohio St.3d 271, 2010-Ohio-6240.]

*Attorneys — Misconduct — Conduct involving dishonesty — Defense that legal argument was made in good faith — Violation found but license suspension stayed.*

(No. 2010-0806 — Submitted September 14, 2010 — Decided December 23, 2010.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 09-017.

————————————

**Per Curiam**.

**{¶ 1}** Respondent, Richard Todd Ricketts of Pickerington, Ohio, Attorney Registration No. 0033538, was admitted to the practice of law in Ohio in 1986.

**{¶ 2}** Relator, Disciplinary Counsel, filed a complaint alleging that respondent had improperly executed, and later released, a mortgage on behalf of a client. The complaint charged respondent with violating DR 1-102(A)(4) and Prof.Cond.R. 8.4(c) (both prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation) and 8.4(h) (prohibiting a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness to practice law).[1]

---

1. On February 1, 2007, the Rules of Professional Conduct became effective, superseding the Code of Professional Responsibility in Ohio. Respondent's conduct that occurred before that time is governed by the Code of Professional Responsibility, and any conduct after February 1, 2007, is governed by the Rules of Professional Conduct.

**{¶ 3}** A panel of the Board of Commissioners on Grievances and Discipline heard the case, issued findings of fact and conclusions of law, and found that respondent had violated Prof.Cond.R. 8.4(c) and (h) but recommended dismissing the alleged violation of DR 1-102(A)(4). The panel recommended a public reprimand. The board adopted the panel's findings and conclusions, except that it found that respondent had violated DR 1-102(A)(4). As a result, the board recommended a six-month suspension from the practice of law in Ohio, with the entire six months stayed.

**{¶ 4}** Respondent filed objections to the findings of the board. After considering the arguments presented in the briefs and the oral argument before us, we adopt the findings and conclusions of the board and suspend respondent from the practice of law in Ohio for six months, with the entire six months stayed.

### Facts

**{¶ 5}** A husband and his wife had developed a company that sold farm equipment and parts. After the husband died in 1993, his wife became the sole shareholder of the company. The wife had to lend the company personal funds to keep it going and to pay its bills. In 2001, the wife decided to liquidate the company and pay off its creditors.

**{¶ 6}** A consultant referred the wife to respondent, whom she then hired to represent the company during the liquidation process. At the time of the liquidation, the company was still solvent, had assets and cash flow, and was meeting its obligations. There were no pending or threatened lawsuits against the company. The wife told respondent that she wanted him to keep the company's creditors from panicking during the liquidation process and to prevent them from moving against their collateral or other assets.

**{¶ 7}** At that time, the company owed money to several large lenders for the equipment floor plan, the financing of the parts division, and a credit line; these loans were secured by the equipment, parts, or the company's personal

property. The wife was personally liable on most of these debts. The company owed smaller amounts to various unsecured creditors.

{¶ 8} The wife also personally owed several lenders, including Ag Credit, a farm credit company. The wife's personal creditors were secured by mortgages on property owned by her. Although some of the money the wife personally borrowed had been put into the company, the company was not a party to those personal loans. Specifically, Ag Credit never gave a loan to the company at any time; in fact, Ag Credit had previously denied the company a loan.

{¶ 9} Respondent discovered in his research that the company owned two pieces of real estate that were essentially unencumbered. Respondent sent an e-mail to the wife stating that in order to force creditors to accept the collateral equipment and parts as full satisfaction of their debt, the creditors "must perceive that they will not otherwise collect from the company." Respondent next suggested that the company needed to "eliminate the potential for equity in the real estate being made available for general unsecured creditors of the company." In order to effectuate this plan, respondent decided that the company would execute mortgages on each of the unencumbered properties to four creditors to whom the wife was personally liable. Of the creditors who received mortgages on land owned by the company, at least two, including Ag Credit, which received a mortgage on both pieces of land, had no lending relationship with the business.

{¶ 10} The mortgages were signed by the wife on behalf of the company in November 2001 and were recorded with the county recorder in December of that year. Ag Credit did not request the mortgage, did not know of the mortgage until years later, and gave no new or extended credit as a result of the mortgage.

{¶ 11} In 2002, the company's personal property assets were auctioned off. At the end of the process, all of the company's debts were satisfied, and the business was closed.

{¶ 12} In 2007, the wife was constructing a building on the property that was encumbered by the 2001 mortgages, and she attempted to obtain a mortgage loan to finance the project. The bank that she approached for the loan performed a title search and discovered the mortgages still attached to the property. Because there was no outstanding debt, all the mortgagees released their mortgages except Ag Credit.

{¶ 13} When the wife called Ag Credit, a representative told her that it had never extended a loan to the company and had no record of a mortgage on the company's land. Ag Credit refused to release the mortgage. The wife asked respondent to handle the matter. When respondent's legal assistant called Ag Credit, it again declined to release the mortgage. Ag Credit referred the matter to its outside counsel, who wrote to respondent explaining Ag Credit's position on the matter.

{¶ 14} Respondent called Ag Credit's attorney, but what was said is disputed. Ag Credit's attorney testified that respondent had told him that "he [understood] that there was no obligation with [the company]," that respondent had "created debt to Ag Credit," and that the mortgage was intended to also "protect the interest of Ag Credit." Respondent testified that he did not remember saying that he had "created debt."

{¶ 15} Respondent told Ag Credit's counsel that if Ag Credit would not release the mortgage, then he would proceed by filing a declaratory-judgment action to quiet title. However, the wife informed respondent that she urgently needed the issue resolved, so respondent drafted and signed a release of Ag Credit's mortgage and the wife filed it with the county recorder. The wife then obtained the loan to construct a building on the land.

{¶ 16} Ag Credit was not sent a copy of the release, and when it discovered that the release had been filed, Ag Credit asked its outside counsel to

4

file a grievance against respondent regarding how he created and released the mortgage.

**Conclusions of Law**

{¶ 17} The allegations of misconduct in this case involve two distinct actions by respondent: (1) the execution of the mortgage on behalf of the company in 2001 and (2) the filing of the release of the mortgage in 2007.

*Execution of the Mortgage*

{¶ 18} The panel and board both concluded that respondent had recorded the mortgages to create the appearance of debt and deceive creditors, not to provide additional protection to the mortgagees. They found the mortgages to be of doubtful legality and likely unenforceable. However, the panel concluded that there was no legal barrier to creating the appearance of debt for a solvent company, so they recommended dismissing the alleged violation of DR 1-102(A)(4). The board disagreed with that conclusion and found that a violation of DR 1-102(A)(4) had occurred.

{¶ 19} Respondent objects to the board's finding of a violation of DR 1-102(A)(4). He argues that he had a good-faith argument that the mortgages were enforceable and that therefore Prof.Cond.R. 3.1 (formerly DR 7-102(A)(2)), as interpreted in *Toledo Bar Assn. v. Rust*, 124 Ohio St.3d 305, 2010-Ohio-170, 921 N.E.2d 1056, ¶ 42 (lawyers are permitted to advance arguments made in good faith), renders his actions within the proper scope of advocacy. Several legal experts testified that his actions, while unorthodox, were not illegal. Additionally, respondent argues that his conduct did not meet the standard for fraud prohibited by DR 1-102(A)(4).

{¶ 20} As an initial matter, respondent's definition of fraud is not dispositive in this case. DR 1-102(A)(4) prohibits an attorney from engaging in "conduct involving dishonesty, fraud, deceit, *or* misrepresentation." (Emphasis added.) DR 1-102(A)(4) was violated if respondent made a misrepresentation or

engaged in conduct involving deceit. This case thus does not turn upon a stringent definition of fraud.

{¶ 21} We agree with the panel and the board that the primary reason respondent recorded the mortgages was to mislead creditors of the company by misrepresenting the true status of the land. If it appeared that all the company's land was mortgaged, secured creditors would be more likely to accept parts and equipment collateral as full satisfaction of the company's debt, and unsecured creditors would be forced to work with respondent's plan for the company's liquidation because there would be no assets for them to pursue.

{¶ 22} Respondent's actions prove that this was his intent. His e-mail specified that creditors needed to "perceive" that they would not be able to otherwise collect from the company and that the best way to do that was to "eliminate the potential for equity" on the land. Then, in a conversation with Ag Credit's attorney, respondent said that he had attempted to "create[] debt" by recording the mortgage, even though there had been no underlying obligation.

{¶ 23} The conclusion that the mortgages were intended to misrepresent the status of the land is also supported by a lack of evidence demonstrating any legitimate purpose that the mortgage could have served. According to Ag Credit's attorney, the mortgage was "meaningless or valueless" to Ag Credit because it had been totally unaware of the mortgage's existence. Additionally, Ag Credit had not lent the company any money that the mortgage could secure.

{¶ 24} Respondent argues that his conduct is not sanctionable, because he had a good-faith belief that he was legally recording the mortgages. DR 7-102(A)(2) prohibits an attorney from making claims unwarranted under the law but does allow claims supported by a "good faith argument for an extension, modification, or reversal of existing law." Respondent argues that the good-faith exception contained in DR 7-102(A)(2) and Prof.Cond.R. 3.1 applies here. Respondent cites *Rust*, in which an attorney filed a wrongful-death lawsuit for his

client, the decedent's heir, but he brought the suit in the name of the estate's administrator, without obtaining the approval of the administrator. 124 Ohio St.3d 305, 2010-Ohio-170, 921 N.E.2d 1056, ¶ 4-6. The attorney was charged with violating Prof.Cond.R. 1.16(a)(1) (requiring a lawyer to decline or terminate representation if "the representation will result in the violation of the Ohio Rules of Professional Conduct or other law"). We dismissed the alleged violation, finding that the attorney had a good-faith belief that he was legally allowed and obligated to bring the case in the name of the administrator. Id. at ¶ 42-46.

{¶ 25} The holding in *Rust* does not insulate respondent's behavior from discipline for two reasons. First, *Rust* does not stand for the proposition that Prof.Cond.R. 3.1 absolves an attorney from all other ethical violations. In *Rust*, the attorney was charged with taking on a representation that would result in an ethical violation; therefore, because there was a good-faith argument that the representation was not a violation, the alleged violation of Prof.Cond.R. 1.16(a)(1) was rendered meritless. Here, respondent is charged with engaging in conduct that involved misrepresentations and deceit; even if the underlying document was arguably legal, his misconduct would still constitute a violation of DR 1-102(A)(4).

{¶ 26} Second, even if the exception in Prof.Cond.R. 3.1 and DR 7-102(A)(2) offered some protection for making misrepresentations, respondent's conduct would not fall under the exception. The language of Prof.Cond.R. 3.1 and its predecessor requires that a novel argument be made in good faith. In this case, we conclude that the mortgage was executed in order to misrepresent the status of the company's land; respondent was not concerned with whether the mortgages would be legally enforceable or valid. Although the rules allow some leeway for legal practice that may test the current boundaries of law, leeway is not given when the intent is to warp the law to make misrepresentations. We need not

decide today whether a mortgage recorded in a similar manner would be legal or enforceable if executed in good faith.

{¶ 27} Therefore, because the mortgage was intended to misrepresent the status of the land and was not executed in good faith, we agree with the board that respondent violated DR 1-102(A)(4).

*Release of the Mortgage*

{¶ 28} Both the panel and the board agreed that respondent violated Prof.Cond.R. 8.4(c) and (h) when he unilaterally released the mortgage. They concluded that although the document he prepared may not have contained any false statements, it was made to appear as if the mortgage had been released by Ag Credit.

{¶ 29} Respondent objects to the determination that he violated Prof.Cond.R. 8.4(c) and (h). His objection is based on a similar argument to the previous objection—namely, that he did not intend to deceive anyone and that he was acting on a good-faith interpretation of existing mortgage law.

{¶ 30} We agree with the panel and the board that respondent did intend to deceive the county recorder who recorded the release and the bank that had discovered the mortgage after the wife asked it for a loan. Respondent recognized that only a mortgagee can release a mortgage, because he asked Ag Credit several times to release the mortgage. He also acknowledged at the disciplinary hearing that the normal practice is that a mortgagee releases the mortgage. When he told Ag Credit's attorney that he planned to file a declaratory-judgment action to quiet title, he knew that the next step after a mortgagee refuses to release a mortgage is to ask the court to quiet title.

{¶ 31} The fact that respondent did not make his position or the status of the debt clear on the release supports the conclusion that he intended to deceive. He filed a document entitled "RELEASE OF REAL ESTATE MORTGAGE IN FAVOR OF AG CREDIT" that contained language a mortgagee would typically

8

use in releasing a mortgage. He did not say that he was representing the mortgagor or that the mortgagee was refusing to release the mortgage. Furthermore, respondent did not provide Ag Credit with a copy of the release and did not notify it that the release had been filed.

{¶ 32} We do not find that the release was based upon a good-faith interpretation of the law. Instead, it was intended to misrepresent and deceive. Therefore, we agree with the panel and board that respondent's conduct violated Prof.Cond.R. 8.4(c) and (h).

{¶ 33} Respondent argues that he was placed in a tough position when the wife told him that she needed the mortgage released right away. However, respondent created the crisis. Had respondent not filed the misleading mortgage, he would not have been placed in this difficult position. Additionally, a client's need for expediency does not provide an attorney with the authority to act outside the ethical rules.

### Sanction

{¶ 34} When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties that the lawyer violated and the sanctions imposed in similar cases. *Stark Cty. Bar Assn. v. Buttacavoli*, 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818, ¶ 16. In making a final determination, we also weigh evidence of the aggravating and mitigating factors listed in Section 10(B) of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). *Disciplinary Counsel v. Broeren*, 115 Ohio St.3d 473, 2007-Ohio-5251, 875 N.E.2d 935, ¶ 21. Because each disciplinary case is unique, we are not limited to the factors specified in the rule but may take into account "all relevant factors" in determining what sanction to impose. BCGD Proc.Reg. 10(B).

**{¶ 35}** The panel found the following mitigating factors: (1) no prior disciplinary actions, (2) lack of a selfish motive, (3) cooperation with the investigation, and (4) respondent's exemplary character and reputation. BCGD Proc.Reg. 10(B)(2)(a), (b), (d), and (e).

**{¶ 36}** The panel found that respondent's continued insistence that what he did was legal and ethical is the only aggravating factor in this case. BCGD Proc.Reg. 10(B)(1)(g). However, because several legal experts also testified that respondent's actions were not improper, the panel did not give this aggravating factor much weight. We also do not accord much weight to this factor.

**{¶ 37}** The panel recommended a sanction of a public reprimand, based solely upon the misconduct of releasing the mortgage. The board found that the execution of the mortgage was also an ethical violation and recommended a six-month suspension from the practice of law, all stayed.

**{¶ 38}** Respondent objects to the board's recommendation. He argues that only misrepresentations made to a court or client should result in a suspension from the practice of law. See *Disciplinary Counsel v. Fowerbaugh* (1995), 74 Ohio St.3d 187, 190, 658 N.E.2d 237; *Disciplinary Counsel v. Greene* (1995)*,* 74 Ohio St.3d 13, 655 N.E.2d 1299, syllabus**.** Neither the ethical standards nor the cases cited by respondent, however, absolve an attorney of sanctions for ethical misconduct based upon who was targeted or harmed by the attorney's misrepresentations. In this case, the misrepresentations could have deceived a governmental body, potential opposing parties, and the public.

**{¶ 39}** The parties agree that this fact pattern is a case of first impression in Ohio, and relator points us to several tangentially similar cases from other states that resulted in sanctions ranging from a public reprimand to disbarment. However, we find our own caselaw regarding misrepresentations made by attorneys sufficient for devising an appropriate sanction.

**{¶ 40}** We have consistently held that "[a] violation of Prof.Cond.R. 8.4(c) will typically result in an actual suspension from the practice of law unless 'significant mitigating factors that warrant a departure' from that principle are present." *Disciplinary Counsel v. Potter*, 126 Ohio St.3d 50, 2010-Ohio-2521, 930 N.E.2d 307, ¶ 10, quoting *Disciplinary Counsel v. Rohrer,* 124 Ohio St.3d 65, 2009-Ohio-5930, 919 N.E.2d 180, ¶ 45. See *Disciplinary Counsel v. Carroll*, 106 Ohio St.3d 84, 2005-Ohio-3805, 831 N.E.2d 1000, ¶13 (violation of DR 1-102(A)(4) usually results in an actual suspension unless mitigating factors warrant a lesser sanction).

**{¶ 41}** Significant mitigating factors are present here. Although we find that respondent intended to make misrepresentations that could mislead others, we do not think that he did so in a malicious or selfish manner. Respondent honestly wanted to fulfill the wife's wish to pay all creditors fully, and he believed that everyone would be paid if he could discourage creditors from seeking the company's unencumbered assets. Everyone did get paid in this instance, and there was no showing that anyone was harmed by the misrepresentations.

**{¶ 42}** The presence of this laudable motive does not excuse his behavior or prevent us from sanctioning him; the methods used by respondent in this matter could easily have been used for more malicious ends and to cause greater harm. It does, however, make us believe that this is a one-time ethical lapse by an attorney with an otherwise sterling reputation that does not merit an actual suspension from the practice of law. Therefore, we suspend respondent from the practice of law in Ohio for six months but stay all six months on the condition that respondent commit no further disciplinary violations. If respondent violates this condition, the stay will be lifted, and respondent will serve the six-month suspension. Costs are taxed to respondent.

Judgment accordingly.

PFEIFER, JONES, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

BROWN, C.J., dissents and would publicly reprimand respondent.

LARRY A. JONES SR., J., of the Eighth Appellate District, sitting for LUNDBERG STRATTON, J.

_____

Jonathan E. Coughlan, Disciplinary Counsel, and Stacy Solochek Beckman, Assistant Disciplinary Counsel, for relator.

Bricker & Eckler, L.L.P., and Alvin E. Mathews Jr., for respondent.

_____